2001 ME 69

**Marion STICKNEY and William Casavant Jr.**

v.

**CITY OF SACO**

and

**William Casavant Jr.**

v.

**William and Tammy DesJardins.**

Supreme Judicial Court of Maine.

Argued: April 11, 2001.
Decided: May 2, 2001.

596

Linda C. Russell, Esq., (orally), Bruce A. McGlauflin, Esq., Petruccelli & Martin, LLP, Portland, for plaintiffs.

S. James Levis Jr., Esq., (orally), Levis & Hull, P.A., Biddeford, (for William and Tammy DesJardins) John J. Wall III, Esq., (orally), Monaghan, Leahy, Hochadel & Libby, LLP, Portland, (for City of Saco) for defendants.

Panel: WATHEN, C.J., and CLIFFORD, RUDMAN, DANA, SAUFLEY, ALEXANDER, and CALKINS, JJ.

RUDMAN, J.

[¶ 1] Marion Stickney and William Casavant Jr.[1] appeal from a judgment entered

---

1. William Casavant Jr. is Marion Stickney's son-in-law. Collectively, Casavant and Stick-    ney will be referred to as the "plaintiffs."

in the Superior Court (York County, *Fritzsche, J.*), that (1) declared Tasker Lane in the City of Saco to be a public way; (2) granted the City of Saco a prescriptive easement in land beyond the paved area of Tasker Lane; and (3) dismissed plaintiffs' § 1983 claim. William and Tammy DesJardins appeal from that portion of the court's judgment concluding that Casavant has an easement, ten feet in width, on the portion of the DesJardinses' property at which the parties share a common boundary. We disagree with parties' contentions and affirm the judgment of the Superior Court.

## I. FACTS & PROCEDURAL HISTORY

### A. The Lane

[¶ 2] This consolidated action involves (1) the determination of the status of Tasker Lane, the narrow road—roughly 100 yards in length—connecting Hill and Lincoln Streets in the City of Saco, and (2) the status of a right-of-way reserved in a 1915 deed across the DesJardinses' property. Tasker Lane was first established as a "private passageway" to the Homestead Farm of Joseph Hill, the common grantor of all the property at issue. The Hill homestead, which sat on what is now the Casavant property, was destroyed in the 1960s.

[¶ 3] The area in question is essentially triangular in shape, bounded on the northwest by Hill Street, on the south by Lincoln Street (formerly known as the "Boom Road"), and on the east by a strip of land owned by parties not involved in this action. Tasker Lane diagonally severs this area in two. Although the City did not pave the lane until 1985, it had maintained the road for over forty years. The Fitanides family helped to plow the lane since the 1940s. Within the past 40 years, however, the family's plowing has been infrequent and undefined in scope. Presently, Tasker Lane is a one-lane, paved road with no sidewalks or curbs. There are no sewer or storm drainage facilities on the road, but there is a water line servicing the area.

### B. The Abuttors

[¶ 4] Since 1928, members of the Fitanides family have owned the southern parcel on the west side of Tasker Lane. Predeceased by her husband roughly 20 years earlier, Viola Fitanides lived there until she died in early 1995. Mrs. Fitanides left the property to her sons, Fred and Theophilus Fitanides. Stickney, Mrs. Fitanides's daughter, purchased the property from her brothers, and, in June 1995, Stickney's daughter and Casavant moved into the Fitanides homestead. As of the date of the trial, they continued to reside there.

[¶ 5] Title to the Casavant and DesJardins lots, located directly across from the Fitanides homestead on the east side of Tasker Lane, was derived from a common grantor, Rishworth Jordan Jr. By deed dated April 6, 1865, Jordan conveyed the property comprising those lots to Samuel F. Tasker. After Samuel's death, his wife—Nellie Tasker—lived there until she died in the early 1950s.[2]

[¶ 6] In 1915, however, Nellie Tasker conveyed the northern portion of her property to Clarence Young. In 1927, Young sold the property to Howard "Harry" Cousens, who later sold it to Walter Cous-

Casavant is a party, on an individual basis, in the action against the DesJardins.

**2.** The plaintiffs provided a copy of Nellie Tasker's will, which was probated in 1954.

The DesJardinses claim she died in 1952, but none of the parties established her exact date of death.

ens. Theophilus Fitanides, one of Stickney's brothers, bought the property in 1965, and conveyed it to John and Sharon Sevigny in 1972. The Sevignys conveyed the property to Energy Homes in 1989. In 1990, Energy Homes sold the property to its current owners, the DesJardinses.

[¶ 7] Nellie Tasker lived on the remaining lot, intending to will it to George Conley, a second cousin who lived with and cared for her until she died.[3] Nellie Tasker lost title to the remaining parcel in 1927, however, having failed to pay the accrued property taxes; the City, the highest bidder, purchased the property for the amount of taxes then owing. The City allowed Nellie Tasker and George Conley to live there until both died.[4] In 1970, the City sold the remaining Tasker parcel to Charles and Germaine Trakas. Casavant then purchased the property in December 1996 from Germaine Trakas.

[¶ 8] In 1867, Jordan conveyed to Elijah Young the property comprising the parcels currently owned by Garry Ribaudo and Carole Fortin.[5] Ribaudo's property abuts Hill Street and extends to both sides of Tasker Lane. A portion of his property is situated immediately north of Stickney's parcel on the west side of Tasker Lane. The other portion is situated to the northwest of the DesJardinses' property on the east side of the lane. Fortin's property is situated to the northwest of the DesJardinses' parcel and does not touch upon Tasker Lane. Although Ribaudo was a party defendant in this action, neither he nor Fortin are involved in this appeal and shall not be further mentioned herein.

[¶ 9] The conveyances from Jordan to the Taskers and Elijah Young refer to a reserved street—Tasker Lane—along the southwesterly bounds of the parcels conveyed. Neither the plans nor descriptions, however, provide a width for the private way or reserved street. According to the undisputed testimony of Paul Ruopp, a licensed land surveyor hired by the plaintiffs, the width of Tasker Lane is 20.6 feet. The lane has been defined in the City's tax maps from 1938 to the present as a city street. In August 1995, the City formally took control of Tasker Lane.

[¶ 10] In response, plaintiffs commenced this action against, *inter alia,* the City, Garry Ribaudo, and the DesJardinses,[6] alleging eight counts. Counts I—V are against the City, including an action for quiet title (Count I), action for easement by prescription (Count II), action for trespass (Count III), action for a taking without the payment of just compensation under the doctrine of reverse condemnation

---

3. Nellie Tasker was apparently unable to care for herself because she suffered from some unidentified mental incapacities. It was unclear from the record whether the incapacity was the consequence of senility or some other mental illness.

4. The record indicates that George Conley may have been removed from the property prior to his death. Also, though the City acquired the property in 1927, there is evidence showing it continued to send tax statements to Nellie Tasker and, when Nellie Tasker died, to George Conley. The City, therefore, may have lost track of this property until it sold the parcel to the Trakases and probably allowed Nellie Tasker and George Conley to stay on the property by mistake. The record further shows that Nellie Tasker's estate was unaware of the tax deed. Indeed, the land passed, on Nellie Tasker's death, to George Conley pursuant to Nellie Tasker's will as though the City never acquired it.

5. Because it does not assist in the understanding of the present action, the intermediary owners of these properties will not be further delineated.

6. The other defendants—the heirs of Rishworth Jordan and Joseph Hill—did not enter an appearance. A default judgment was entered against them.

(Count IV), and an action pursuant to 42 U.S.C. § 1983[7] alleging procedural due process violations (Count V).

[¶ 11] Count VI is an action to quiet title against the heirs of Rishworth Jordan and Joseph Hill. Count VII is a quiet title action against the DesJardinses and Sevignys. Count VIII is a quiet title action against Ribaudo. By an answer, the City denied the material allegations in the complaint and asserted four affirmative defenses, including the Maine Torts Claims Act and the failure to state a claim upon which relief may be granted.

[¶ 12] On September 17, 1998, plaintiffs filed an amended complaint adding two counts. Count IX is a claim alleging that Casavant has an easement over the DesJardinses' property. Count X is a request for damages for trespass or nuisance arising out of the DesJardinses' obstruction of the easement. The trial court concluded that Tasker Lane was a public way and found for each of the defendants on Counts I, II, VII, and VIII. The court further found that plaintiffs' Count III trespass claim was not supported by evidence and that the claim also failed because plaintiffs did not comply with the requirements of the Maine Tort Claims Act prior to bringing suit. Similarly, the court found that "[n]either Count IV for inverse condemnation nor Count V for a due process violation is supported by the legal requirements for the claim or on the facts." With respect to counts IX and X, the court

found in favor of Casavant, concluding that there was no waiver of the easement and no loss of it through adverse obstruction. This appeal followed.[8]

## II. DISCUSSION

[¶ 13] We will uphold the Superior Court's factual findings unless they are clearly erroneous. *Sturtevant v. Town of Winthrop*, 1999 ME 84, ¶ 9, 732 A.2d 264, 267. "[T]he trial judge's findings stand unless they clearly cannot be correct because there is *no* competent evidence to support them." *Id.* (quoting *Harmon v. Emerson*, 425 A.2d 978, 982 (Me.1981)). "[T]he function of an appellate court is not to review a cold transcript and draw its own factual inferences; rather, appellate review of factual findings is limited to [an] investigation of the record before [the appellate court] to determine whether competent evidence exists to support the lower tribunal's factual conclusions." *Id.* (quoting *Lewisohn v. State*, 433 A.2d 351, 354 (Me.1981)). We will also give due regard to the opportunity of the trial court to judge the credibility of the witnesses. *Pine Ridge Realty, Inc. v. Massachusetts Bay Ins. Co.*, 2000 ME 100, ¶ 23, 752 A.2d 595, 601 n. 12 (citations omitted).

[¶ 14] In addition, we will vacate a trial court's conclusion that a prescriptive easement was formed only if we determine that the evidence below compelled a contrary holding. *Glidden v. Belden*, 684 A.2d 1306, 1316 (Me.1996). It is not suffi-

---

7. 42 U.S.C. § 1983 provides in part:
   Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . ., subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983 (2000).

8. On appeal, the plaintiffs have not challenged the Superior Court's ruling on their prescriptive easement (Count II) and their trespass (Count III) claims against the City. The plaintiffs' failure to brief those claims constitutes their abandonment of the claims on appeal. *See Aseptic Packaging Council v. State*, 637 A.2d 457, 462–63 (Me.1994).

cient to show that the trial court arguably could have concluded that the evidence supports a contrary result. *Id.*

### A. Tasker Lane is a Public Way

[¶ 15] The doctrine that the public-at-large is capable of acquiring a non-possessory interest in land has long been accepted in Maine. *Town of Manchester v. Augusta Country Club*, 477 A.2d 1124, 1128 (Me.1984) (citations omitted). Such non-possessory interests commonly arise in three ways: by the statutory method of layout and acceptance pursuant to 23 M.R.S.A. § 3022 *et seq.*, by dedication and acceptance, or by prescription. *Id.* at 1129; *see also Longley v. Knapp*, 1998 ME 142, ¶ 9, 713 A.2d 939, 942. In this case, the City claims an interest in Tasker Lane by prescription.

[¶ 16] The requirements for the creation of a public way by prescriptive use parallel those for the creation of a prescriptive easement. *Longley*, ¶ 14, 713 A.2d at 943. "The party asserting an easement by prescription must prove continuous use for 'at least 20 years under a claim of right adverse to the owner, with his knowledge and acquiescence, or a use so open, notorious, visible, and uninterrupted that knowledge and acquiescence will be presumed.'" *Shadan v. Town of Skowhegan*, 1997 ME 187, ¶ 6, 700 A.2d 245, 247 (quoting *Jost v. Resta*, 536 A.2d 1113, 1114 (Me.1988)). These elements must be proved by a preponderance of the evidence. *Glidden*, 684 A.2d at 1317.

[¶ 17] The trial court concluded that the City has established Tasker Lane as a public way by prescriptive use. The court was influenced by numerous facts, including that: (1) the City has maintained and plowed the·lane for well beyond the required time; (2) members of the general public could drive over the street; (3) people from nearby streets have used the lane as if it was a public way; and (4) the City

paved the street. The court also found that, while the intensity of City control increased in 1995, all of the requirements for creating a public way by prescriptive use existed.

### i. Continuous Use for at Least 20 Years

[¶ 18] "Continuous" means "occurring without interruption." *Striefel v. Charles–Keyt–Leaman P'ship*, 1999 ME 111, ¶ 16, 733 A.2d 984, 993 (quoting BRYAN A. GARNER, A DICTIONARY OF MODERN LEGAL USAGE 213 (2d ed.1995)). Continuous possession and use requires only the kind and degree of occupancy (i.e., use and enjoyment) that an average owner would make of the property. *Id.* (citations omitted). For the purposes of a public easement, however, evidence of the use of a road by the abutting landowners to access their own land is insufficient to establish the existence of a public prescriptive easement. Rather, the test of a public use is the use of the road by people who are inseparable from the public generally; it is not the frequency of the use of the number of people using the way. *Id.; see also Longley*, 1998 ME 142, ¶ 14, 713 A.2d at 944 (holding, "[c]ontinuous public use is not determined by 'the frequency of the use, or the number using the way, but its use by people who are not separable from the public generally.'").

[¶ 19] There is sufficient, competent evidence in the record to support the court's finding that the City and the public's use was continuous for over 40 years, well beyond the 20 year requirement. *See Eaton v. Town of Wells*, ¶ 35–37, 760 A.2d 232, 245 (finding as compelling the testimony of residents regarding use of beach). Such a finding is not clearly erroneous.

### ii. Claim of Right that is Adverse to the Owner

[¶ 20] There must be a showing that·the use of Tasker Lane by the

public was under a claim of right that is adverse to the owner. *Augusta Country Club,* 477 A.2d at 1130. "Under a claim of right" means that the claimant "is in possession as owner, with intent to claim the land as [its] own, and not in recognition of or subordination to [the] record title owner." *Striefel,* 1999 ME 111, ¶ 14, 733 A.2d at 991–92.

[¶ 21] A use is adverse "when a party . . . has received no permission from the owner of the soil, and uses the way as the owner would use it, disregarding [the owner's] claims entirely, using it as though he owned the property himself. . . ." *S.D. Warren Co. v. Vernon,* 1997 ME 161, ¶ 11, 697 A.2d 1280, 1283 (citation omitted). In a majority of jurisdictions, where there has been an open, unmolested, and continuous use for the prescribed period with the knowledge and acquiescence of the owner, such use is presumed to have been adverse. *Augusta Country Club,* 477 A.2d at 1130 (citations omitted).

[¶ 22] The record supports the trial court's conclusion that the public and the City intentionally possessed and used the lane as though they owned it, without recognition of—or subordination to—the true owner. The testimony at trial shows that the public and the City's use has been open, unmolested, and continuous for well over 20 years. The record evidence, therefore, supports the trial court's finding that the City possessed and used the parcel "under a claim of right" that was adverse to the owner throughout the limitations period.

iii. Knowledge and Acquiescence

[¶ 23] "Acquiescence by the owner to the use is essential, and, in this regard, the acquisition of an easement by prescription differs from the acquisition of title by adverse possession." *Shadan,* ¶ 6, 700 A.2d at 247 (quoting *Augusta Country*

*Club,* 477 A.2d at 1130). "Acquiescence implies 'passive assent or submission to the use, as distinguished from the granting of a license or permission given with the intention that the licensee's use may continue only as long as the owner continues to consent to it.'" *Id.,* ¶ 7 (quoting *Augusta Country Club,* 477 A.2d at 1130). Acquiescence is "consent by silence." *Augusta Country Club,* 477 A.2d at 1130 (quoting *Dartnell v. Bidwell,* 115 Me. 227, 230, 98 A. 743, 745 (1916)). The testimony, which the court found credible, demonstrates that the owners have acquiesced to the public and City's use. The testimony shows that no one ever asked for permission to use the lane and the owners never obstructed its use until this action was commenced. The trial court did not err in finding that the owners acquiesced to the public's use of Tasker Lane.

### B. The Easement Extends Beyond the Paved Lane

[¶ 24] Pursuant to a motion by the City, the Superior Court (York County, *Fritzsche, J.*) amended its judgment to add that "a boundary survey by Paul Ruopp dated April 1, 1998, accurately depicts on the face of the earth the metes and bounds of Tasker Lane." The plaintiffs contend that the trial court erred by granting prescriptive-easement rights beyond the paved portion of Tasker Lane. Ruopp, plaintiffs' expert witness, testified on direct examination as follows:

> My conclusion, after researching the records and evaluating the physical evidence on the ground, is that the width of the lane is 20.6 feet. This is true because we traveled what encompassed the travel lane, the width between the adjoining property is 20.6 feet.

This testimony was never controverted by the plaintiffs in any way. *See Glidden,* 684 A.2d at 1317 (Me.1996) (finding uncontro-

verted testimony influential in determining a lack of acquiescence for purposes of prescriptive easement). The trial court, therefore, did not err in finding that the width of the lane was 20.6 feet, extending beyond the paved portion of the lane.

[¶ 25] Plaintiffs argue, alternatively, that, even if the shoulder portions of the lane were generally considered to be a part of the easement prescriptively obtained, their regular and continuous use of that portion near the Stickney homestead for parking prevented it from being prescriptively obtained. The trial court found that the requirements for the creation of a public way by prescriptive use existed for about 40 years. Hence, for 40 years, the lane—including the unpaved portion—has been a public way. As we have noted in the past, "one cannot assert a claim of title by adverse possession against a municipality." *Flower v. Town of Phippsburg,* 644 A.2d 1031, 1032 (Me.1994) (citing *Phinney v. Gardner,* 121 Me. 44, 48–49, 115 A. 523, 525 (1921)). Plaintiffs' claim, therefore, lacks merit.

### C. The Trial Court Did Not Err By Dismissing the Plaintiffs' § 1983 Claims

[¶ 26] The plaintiffs contend that the trial court erred in its decision to deny their constitutional claims. Although this part of the plaintiffs' claim was brought under 42 U.S.C. § 1983, they also relied on provisions in the Maine Constitution. In particular, the plaintiffs argue that the City has violated their constitutional rights by: (1) taking their property without just compensation in violation of U.S. Const. Amend. V and Me. Const. art. I, § 21; (2) taking their property without a justifiable public purpose in violation of U.S. Const Amend. V and Me. Const. art. I, § 21; and (3) violating their property

rights in an arbitrary.and capricious manner without legal authority.

[¶ 27] The plaintiffs' federal and state takings claims are unpersuasive. Generally speaking, "[t]he theory of prescriptive easement does not grant the State affirmative authority to take property without just compensation." *Weidner v. Dep't of Transp. and Pub. Facilities,* 860 P.2d 1205, 1212 (Alaska 1993). Nevertheless, "the prescriptive period—as with any statute of limitations[ ]—requires a private landowner to bring an inverse condemnation action for public use of private property within a specified period of time." *Id.* At the expiration of that time, the landowner's right to bring suit is extinguished, effectively vesting property rights in the adverse user. *Id.* The plaintiffs' state takings claim, therefore, has been extinguished by the expiration of the prescriptive period. Similarly, plaintiffs' federal takings claim, pursuant to § 1983, has been extinguished by the expiration period prescribed under 14 M.R.S.A. § 752 (1980). *See McKenney v. Greene Acres Manor,* 650 A.2d 699, 701 (Me.1994) (stating, "[a]ll claims brought pursuant to section 1983 must be characterized as personal injury actions governed by the general statute of limitations period applying to personal injury claims"—i.e. 14 M.R.S.A. § 752).

### D. The Superior Court Did Not Err In Concluding That William Casavant Jr. Has An Easement Over The DesJardinses' property

[¶ 28] In October 1915, Nellie Tasker deeded to Clarence Young what is now the DesJardinses' property. The deed provided the following description:

[A] certain lot or parcel of land situated in said Saco, located and bounded as follows Viz; South-westerly [sic] eighty feet by a private way, known as Taskers

[sic] Lane, North-westerly [sic] one hundred and forty feet by land of Dora Young Hobbs and land of said Clarence L. Young; Northeasterly eighty feet to land of Frank L. Davis and land of Clarence L. Young and South-easterly [sic] one hundred and forty feet by land of grantor, *reserving a right of way, ten feet wide on the South-easterly* [sic] *side of said lot, from said Taskers Lane to the rear of grantors buildings, said way to be unobstructed.*

(Emphasis added). The right-of-way was used for a time by George Conley for the delivery of fertilizer to his garden. The position of the barn that existed at that time had blocked access to the back of Nellie Tasker's property.[9] The right-of-way, the length of which is in dispute, was also used to access the outhouse located at the back of a barn. The barn and the home in which Nellie Tasker and George Conley lived was part of the original Homestead of Joseph Hill, the original grantor of all the properties at issue; it was destroyed some time after George Conley died.[10] The right-of-way was not used for parking purposes.

[¶ 29] As previously discussed, though the City took title to the property around 1927 by a tax deed, it allowed Nellie Task-er and George Conley to continue residing there until the 1950s when both died; there is evidence that George Conley used the easement well past 1927. In 1972, the City sold the property (the dominant estate) to Charles and Germaine Trakas. The right-of-way was not mentioned in the Trakases' deed or in any deeds of record since the City acquired the Casavant property. Indeed, Casavant was unaware of the easement until after this litigation started. With respect to the DesJardinses' property (the servient estate), Energy Home's deed to the DesJardinses also failed to reflect the right-of-way. The right-of-way, however, was consistently referenced in deeds conveying the DesJardinses' property up until 1972.

[¶ 30] The present dispute revolves around the meaning of the reservation. The DesJardinses first assert that the 1915 deed conveying the easement did not include the technical terms "heirs" and "excepting," which were required under Maine law to create an interest in land of perpetual duration. Because only the term "reserving" was used, they argue that the conveyance created only a life estate in Nellie Tasker; the easement, therefore, extinguished when Nellie Tasker died.[11] The trial court, however, found

---

**9.** According to Fred Fitanides, George Conley had to use the right-of-way because "[h]e had no other way of getting [to the] back [of the barn]." Apparently, the other part of the property was too hilly.

**10.** George Conley died sometime in the 1950s.

**11.** The DesJardinses also assert that the section upon which Casavant relies, § 772(1) of the Short Form Deeds Act (*see infra* note 12), was enacted two years *after* the present suit commenced, and consequently, does not apply to this action. *See* 1 M.R.S.A. § 302 (1989) (stating, "[a]ctions and proceedings pending at the time of the passage, amendment or repeal of an Act or ordinance are not

affected thereby"). The DesJardinses appear to be making this argument for the first time on appeal. "We have repeatedly held that, '[n]o principle is better settled than that a party who raises an issue for the first time on appeal will be deemed to have waived the issue, even if it is one of constitutional law.'" *McAfee v. Cole*, 637 A.2d 463, 467 (Me.1994) (quotation omitted).

Even if the claim was preserved, it lacks merit. The statute states, in relevant part, "[a] conveyance or reservation of real estate, *whether made before c⁻ after the effective date of this section,* must be construed to convey or reserve an estate in fee simple, unless a different intention clearly appears in the deed." 33 M.R.S.A. § 772(1) (emphasis added). 33

"no waiver of the easement and no loss of it through adverse obstruction." It further concluded that the DesJardinses' technical-word claims fail under the analysis provided in *O'Neill v. Williams*, 527 A.2d 322 (Me.1987). *See O'Neill v. Williams*, 527 A.2d 322, 324 n. 1 (Me.1987).

▆▆▆▆ [¶ 31] An easement is a right of use over the property of another. *O'Donovan v. McIntosh*, 1999 ME 71, ¶ 7, 728 A.2d 681, 683. The law recognizes two different types of easements: an easement in gross and an easement appurtenant. *Id.* An easement appurtenant is created to benefit the dominant tenement and runs with the land. *Id.* To be appurtenant, however, the easement must also be attached to or related to a dominant estate of the grantor. *Id.*

▆▆▆▆ [¶ 32] An easement in gross may generally be described as an interest in land which "is not appurtenant to any estate in land or not belonging to any person by virtue of his ownership of an estate in other land, but is a mere personal interest in or right to use the land of another." *LeMay v. Anderson*, 397 A.2d 984, 987 n. 2 (Me.1979) (quoting *Reed v. A.C. McLoon & Co.*, 311 A.2d 548, 552 (Me.1973)). Generally, because it is purely a personal right, an easement in gross is not assignable, absent evidence of the parties' intent to the contrary, and terminates upon the death of the individual for whom

it was created. *O'Neill*, 527 A.2d at 323; *see also O'Donovan*, 1999 ME 71, ¶ 10, 728 A.2d at 684 (holding an easement in gross is assignable when the parties clearly intend that it is assignable; this policy promotes free alienability of land, which is a general policy of property law).

▆▆▆ [¶ 33] The traditional rules of construction for grants or reservations of easements required that, whenever possible, an easement be fairly construed to be appurtenant to the land of the person for whose use the easement is created. *O'Neill*, 527 A.2d at 323. In resolving this issue, we construe the deed in light of the law existing at the time it was made. *Id.* (citing *Stuart v. Fox*, 129 Me. 407, 419, 152 A. 413, 418 (1930), *cert. denied*, 284 U.S. 572, 52 S.Ct. 15, 76 L.Ed. 498 (1931)).

[¶ 34] Under the common law, the unyielding rule required that, to create an interest of perpetual duration in land by deed to an individual, it was necessary to use the technical word "heirs." *O'Neill*, 527 A.2d at 323. If this word were omitted from the deed, the grantee received only a life interest, no matter how plainly the deed expressed an intention to convey an interest of perpetual duration. *Id.* at 324. We early perceived, however, that this conceptual posture and consequent imposition of an apparently arbitrary technical requirement of the word "heirs" oper-

---

. M.R.S.A. § 772(1) clearly states it is to apply retroactively; 1 M.R.S.A. § 302, therefore, is not controlling. *See Reagan v. Racal Mortg., Inc.*, 1998 ME 188, ¶ 7, 715 A.2d 925, 927–28 (holding "section 302 provides a rule of construction only, and the rule is controlling 'absent clear and unequivocal language to the contrary' "); *Terry v. St. Regis Paper Co.*, 459 A.2d 1106, 1109 (Me.1983) (reiterating well-established notion that "all statutes will be considered to have a prospective operation only, unless the legislative intent to the contrary is clearly expressed or necessarily implied from the language used").

The DesJardinses also argue that the use of the term "estate" in section 772(1) makes the statute inapplicable to the present situation, which involves an easement. This claim is also unpersuasive and is an overly restrictive interpretation of the statute. Section 772 specifically calls for a liberal construction. 33 M.R.S.A. § 772(5) (stating "[t]his section must be liberally construed to effect the legislative purpose of clarifying title to land currently encumbered by ancient deeds that lacked technical words of inheritance or an habendum clause").

ated, in most instances, to frustrate the intention of the parties. *Id.*

[¶ 35] "Consequently, to give effect to the intention of the parties this court has routinely . construed a provision in a deed purporting to reserve an easement for the benefit of land retained by the grantor as the creation of an easement appurtenant to that land and has obviated the requirement of the technical word 'heirs' to preserve an interest of perpetual duration." *Id.* This result was usually accomplished by

> [T]reating the reservation as an exception. Strictly speaking, an exception at common law "excepted" or excluded from the conveyance a portion of the land conveyed. Since the grantor's interest was therefore unaffected by the conveyance no technical words were necessary to preserve that interest.

*Id.* at 324 n. 1. The distinction between "reservation" and "exception," however, is now virtually obsolete because the intention of the parties—not the words in the deed—controls and the two terms are used interchangeably. *Id.; see also* 33 M.R.S.A. § 772 at *infra* note 12.

[¶ 36] In *O'Donovan,* we reiterated the *O'Neill* concept that, "to give effect to the intent of the parties and promote alienability, we have abolished the technical requirement that the word 'heirs' be used to preserve an interest of perpetual duration." *O'Donovan,* 1999 ME 71, ¶ 10, 728 A.2d at .684. Casavant contends that this statement and the relevant provisions of the Short Form Deeds Act ("Act") has abolished the requirement that the term "heirs" be used even when construing instruments drafted prior to the effective date of the Act. *See* 33 M.R.S.A. § 772 (Supp.2000–2001).[12] Although it leads to the same result, this is not an accurate recitation of the present status of the law.

[¶ 37] In the *O'Donovan* case, the deed in question was drawn in 1989. *O'Donovan* ¶ 3, 728 A.2d at 682. There was no need to discuss the construction of pre-Act deeds. Moreover, we have consistently stated that the technical terms will *only* be disregarded if the intent of the parties is clearly discernable from the facts of a given case or from the deed. *See O'Donovan,* ¶ 3, 728 A.2d at 682; *O'Neill,* 527

---

12. Section 772 of the Short Forms Deeds Act provides, in full:

1. **Words of inheritance; habendum.** In a conveyance or reservation of real estate, the terms "heirs," "successors," "assigns" "forever" or other technical words of inheritance, or an habendum clause, are not necessary to convey or reserve an estate in fee. A conveyance or reservation of real estate, whether made before or after the effective date of this section, must be construed to convey or reserve an estate in fee simple, unless a different intention clearly appears in the deed.

2. **Preservation of rights.** A person claiming an interest in real estate by reason of the omission of technical words of inheritance or the lack of an habendum clause in a deed that conveyed or reserved a property interest before October 7, 1967 may preserve that claim by commencing a civil action for the recovery of that property in the Superior Court or the District Court in the county or division in which the property is located on or before December 31, 2002.

3. **Limitation.** After December 31, 2002, a person may not commence a civil action for the recovery of property or enter that property under a claim of right based on the absence of an habendum clause or technical words of inheritance in any deed.

4. **Construction of laws.** This section may not be construed to extend the period for bringing of an action or for the doing of any other required act under any statute of limitations.

5. *Liberal construction.* This section must be liberally construed to effect the legislative purpose of clarifying title to land currently encumbered by ancient deeds that lacked technical words of inheritance or an habendum clause.

33 M.R.S.A. § 772 (Supp.2000–2001).

A.2d at 324; *Gilder v. Mitchell,* 668 A.2d 879, 882 (Me.1995).

[¶ 38] In *O'Neill,* the reservation within the 1882 deed failed to include the word "heirs." *O'Neill,* 527 A.2d at 323. We, nevertheless, refused to apply the "unyielding" common-law rule because the grantor "clearly intended," as a littoral property owner, that the easement across the land conveyed should benefit the land retained. *Id.* at 324. "Otherwise[,] access to water was cut off by the conveyance, appreciably diminishing the value of the retained land." *Id.* We further noted, "[i]t is highly unlikely that the grantor would knowingly have impaired the value of the property he retained by limiting the easement to a life interest." *Id.*

[¶ 39] We limited the *O'Neill* result, however, to circumstances where the intent of the grantor can be presumed from the facts at play. *See Gilder v. Mitchell,* 668 A.2d 879, 882 (Me.1995) (stating that because there was no plainly expressed intention to reserve an interest of perpetual duration, this case is not "similar to *O'Neill,* where the grantor's intent that the easement should benefit his retained land" could be presumed from the facts). In fact, we made clear, in *Gilder,* that pre-Act deeds would still be construed under the laws existing at the time they were drawn, unless the parties' intent as discerned from the facts or the deed clearly indicated a contrary result. *Gilder,* 668 A.2d at 881.

[¶ 40] The trial court found that it was Nellie Tasker's intent to make the reservation a perpetual interest. The evidence shows that George Conley used the right-of-way to have fertilizer transported to his garden. Although he was never a legal owner of the property and the use to which he put the right-of-way arose after it was established, his use indicated that it was the only way to access the yard at the back

of the barn. Further supporting this "only access" analysis is the fact that the right-of-way was also the only way to access an outhouse at the back of the barn. This use, presumably, *did* exist at the time the deed was drafted.

[¶ 41] Nellie Tasker's intent, therefore, that the easement at issue be perpetual in nature is clearly discernable from the fact that the right-of-way was used to access the yard at the back of the barn, which otherwise would have been inaccessible given the surrounding hilly terrain. Presumably, moreover, she expected that the barn would remain standing after her death and the need to access the back yard would not cease upon her death. The evidence, therefore, supports the trial court's determination that the grantor, Nellie Tasker, intended to create a reservation that was perpetual in nature. The trial court, therefore, did not err in finding that the right-of-way did not terminate upon Nellie Tasker's death.

### F.   Whether the Easement was Terminated

■ [¶ 42] The next question, then, is whether the easement has been terminated. An easement can be extinguished in five ways: (1) by expiration; (2) by an act of the dominant owner (either by release or abandonment); (3) by the act of the servient owner (by prescription or conveyance to a bona fide purchaser without notice); (4) by conduct of both parties (merger or estoppel); or (5) by eminent domain, mortgage, foreclosure, or tax sale. *Great Cove Boat Club v. Bureau of Public Lands,* 672 A.2d 91, 94 (Me.1996) (citing 3 RICHARD R. POWELL, THE LAW OF REAL PROPERTY ¶¶ 421–426 (1992)). In this case, the parties focus on the second, fourth, and fifth methods for terminating easements.

i. Equitable Estoppel

[¶ 43] The trial court found that there was "insufficient evidence that the doctrine of estoppel should be applied because of the silence of Trakas, who was unaware of the easement, during the construction by the DesJardines of a driveway over a portion of the likely location of the easement." The DesJardines argue that the trial court erred by so ruling because Trakas, Casavant's predecessor in title, through inaction and silence, caused the DesJardines to materially alter their position to their detriment.

[¶ 44] The doctrine of equitable estoppel "bars the assertion of the truth by one whose misleading conduct has induced another to act to his detriment in reliance on what is untrue." *Longley*, 1998 ME 142, ¶ 12, 713 A.2d at 943 (quoting *Anderson v. Comm'r of Dep't of Human Servs.*, 489 A.2d 1094, 1099 (Me. 1985)). Equitable estoppel precludes an owner from asserting his legal title when, by his own action or inaction, he has caused another to act or to alter her position to her detriment. *Id.* Intent to mislead is not required—equitable estoppel may be applied when a party "remains silent when it is his duty to speak, as where inquiries are made of him ... or when circumstances are such that would 'impel an honest man to speak.'" *Id.* (quotations omitted). Equitable estoppel should be "carefully and sparingly applied." *Id.* We review a court's application of equitable estoppel for clear error. *Id.*

[¶ 45] Given the facts of this case, the doctrine of equitable estoppel does not apply. The DesJardines are not innocent purchasers entitled to application of the doctrine; they are charged with constructive notice of the easement because the easement has been recorded in conveyances of their servient property up until 1972. *See Hendley v. Overstreet*, 253 Ga. 136, 318 S.E.2d 54, 55 (1984) (finding that easement continues to burden property owner's parcel because property owners are not innocent purchasers without notice; recorded deeds and restrictive covenants are constructive notice).

[¶ 46] The right and burden relative to an appurtenant easement respectively pass to grantees of the dominant and servient tenements, assuming the grantees of the servient tenement have actual or constructive notice of the easement. *O'Neill*, 527 A.2d at 323 (citing *LeMay*, 397 A.2d at 989). Before purchasing real estate, a purchaser should clear up the doubts which apparently hang upon the title, by making due inquiry and investigation. *Waxler v. Waxler*, 1997 ME 190, ¶ 11, 699 A.2d 1161, 1164.

[¶ 47] The easement is of record. Had the DesJardines made due inquiry and investigation, they would have found that an easement existed where they built their driveway. The DesJardines' problems, consequently, are self-made; they should not be allowed to invoke an equitable doctrine when they themselves have failed to act in a responsible manner. *See Hamm v. Hamm*, 584 A.2d 59, 61 (Me.1990) (stating, "it is an elementary principle of equity jurisprudence that 'whenever a party, who as actor seeks to set the judicial machinery in motion and obtain some remedy, has violated conscience or good faith, *or other equitable principle in his prior conduct,* then the doors of the court will be shut against him in limine; the court will refuse to interfere on his behalf, to acknowledge his right or to award him any remedy' "). The trial court did not err in rejecting the DesJardines' estoppel claim.

ii. Title Argument

[¶ 48] The DesJardines next assert that the trial court erred in concluding

that the Casavant property benefitted from the easement reserved by Nellie Tasker in 1915. They assert that, because Casavant's property title was obtained through the City and not from Nellie Tasker or a Tasker heir, any rights to the easement have long been extinguished. In other words, they appear to be arguing that, because Casavant acquired title from a party who purchased the property in a tax sale, the easement has been extinguished.

[¶ 49] Whether a tax sale can extinguish an easement is an issue of first impression in Maine. Although there is no unanimity among the various jurisdictions on this question, a substantial number of states have found that a tax sale does not extinguish an easement appurtenant where its value or burden is included in the assessed value of the properties at issue. 3 RICHARD R. POWELL, POWELL ON PROPERTY ¶ 426 n. 18 (1992). *See also Hearn v. Autumn Woods Office Park Prop. Owners Ass'n*, 757 So.2d 155, 162 (Miss.2000) (holding "[t]his Court joins the majority of jurisdictions that hold that an easement appurtenant ... is not extinguished because of a tax sale, if that easement is properly assessed and included in the value of the property"; owner of servient property failed to overcome presumption that value of easement was included in assessment of lot that he acquired by tax deed); *Flax v. Smith*, 20 Mass.App.Ct. 149, 479 N.E.2d 183, 185 (Mass.1985) (stating servient estate that was sold in a tax sale was burdened by implied easement for water and sewer lines where all parcels had been in common ownership prior to taking of servient parcel for nonpayment of taxes, use of residences on such parcel required that water and sewer services be supplied through lines to the street, and reasonable necessity for continued use of existing line

was shown); *Ross v. Franko*, 139 Ohio St. 395, 40 N.E.2d 664, 665 (1942) (holding that tax sale does not ordinarily divest easement charged on property sold). Maine is a state that includes the value of non-possessory interests in the tax valuation of property. *See Central Maine Power Co. v. Town of Turner*, 128 Me. 486, 148 A. 799 (1930) (holding power company held mill privileges for dam and power development that could be considered in determining value of its property). Accordingly, we adopt the rationale put forth by the above-cited cases and conclude that an easement is not extinguished upon a tax sale.

iii. Abandonment

[¶ 50] The DesJardinses contend that the trial court committed a clear error by ruling that the easement has not been abandoned. The effectiveness of an abandonment depends on a finding of intention. *Great Cove Boat Club*, 672 A.2d at 94 (citation omitted). The requisite intent to abandon an easement may be demonstrated by unequivocal acts which are decisive and conclusive and indicate a clear intent to extinguish the easement. *Id.; see also Phillips v. Gregg*, 628 A.2d 151, 153 (Me.1993) (stating "[t]o prove intent to abandon, a party must show 'unequivocal acts inconsistent with the further assertion of rights associated with the existence of the easement .... The acts asserted as evidence of abandonment must be decisive and conclusive and thereby indicate a clear intent to abandon the easement' ").

[¶ 51] The party alleging abandonment of a right-of-way has the burden of proving, by clear and convincing evidence, either: (1) a history of nonuse coupled with an act or omission evincing a clear intention to abandon, or (2) adverse possession by the servient estate. *Canadian Nat'l Ry. v. Sprague*, 609 A.2d 1175,

1179 (Me. 1992). For the purposes of the first method, the acts asserted as evidence of abandonment "must be decisive and conclusive ... thereby indicat[ing] a clear intent to abandon the easement." *Witt v. McKenna,* 600 A.2d 105, 106 (Me.1991) *Id.* (quoting *Chase v. Eastman,* 563 A.2d 1099, 1102 (Me.1989)). To meet this burden, the evidence must establish each factual element to be highly probable. *Id.* (citation omitted). Although we have recognized that the acquiescence to the erection of a permanent barrier on a right-of-way can satisfy the burden, nonuse alone, regardless of the duration, is insufficient to extinguish a right-of-way. *Id.* (citing *Chase,* 563 A.2d at 1102 (failure to object to the construction of a cottage partly in the path of a right-of-way constituted partial abandonment of an easement)); *Fitzpatrick v. Boston & Maine R.R.,* 84 Me. 33, 24 A. 432 (1891) (failure to object to erection of houses of a "permanent character" obstructing easement supported finding that easement was abandoned).

[¶ 52] Although the DesJardinses' driveway is arguably a permanent structure, it is not a decisive act that *permanently* obstructs the right-of-way, compelling an objection for the purposes of abandonment. *See Phillips,* 628 A.2d at 153 (stating "[f]ailure to object to a decisive act on the part of the servient estate may constitute an omission evincing a clear intent to abandon"). Instead, it arguably facilitates the use of at least a portion of the right-of-way. The DesJardinses have not met their burden of showing that the easement has been abandoned. Their claim, therefore, under a theory of abandonment fails.

iv. Vehicular Use

[¶ 53] Pursuant to the DesJardinses' post-judgment motion, the trial court amended the judgment to provide that traffic is permitted over the easement and that tenant parking in the easement would constitute an obstruction. In so finding, the DesJardinses contend that the trial court committed a clear error. The construction of language creating an easement is a question of law, which we review *de novo.* *Anchors v. Manter,* 1998 ME 152, ¶ 16, 714 A.2d 134, 139 (citing *Fine Line, Inc. v. Blake,* 677 A.2d 1061, 1063 (Me.1996)); *see also Crispin v. Town of Scarborough,* 1999 ME 112, ¶ 30, 736 A.2d 241, 250 (same). If the language of the deed is unambiguous, the scope of a party's easement rights is determined solely from that language. *Crispin,* ¶ 30, 736 A.2d at 250 (quoting *Rancourt v. Town of Glenburn,* 635 A.2d 964, 965 (Me.1993)). If the language of the deed is ambiguous, however, extrinsic evidence may be considered to determine the intent of the parties. *Anchors,* ¶ 16, 714 A.2d at 139.

[¶ 54] Here, neither the specific scope of the right-of-way nor its precise length is known. *Id.* In such a case, the intention of the parties creating the easement is a question of fact. *Id.* at 139–40. We will uphold "the trial court's determination regarding the objective manifestation of the parties' intent unless it is clearly erroneous." *Id.* at 140 (quoting *Guild v. Hinman,* 1997 ME 120, ¶ 8, 695 A.2d 1190, 1193).

[¶ 55] The evidence shows that deliveries of fertilizer were made to the yard at the back of the barn and that a vehicle of some sort would have also been needed to maintain the outhouse that was located there. Vehicular use, therefore, is not beyond the scope of the original use of the easement, and the court did not err in permitting the use of vehicles on the right-of-way.

The entry is:

Judgment affirmed.